Next case we're going to take is, I guess, plaintiffs. I don't know who they are, but plaintiffs v. Pfizer, and we'll hear from Mr. Ho. Before we begin, I'd like to make a disclosure to counsel that one or more of the judges take Lipitor or other statins, and we've concluded that that doesn't give rise to recusal. You should be aware. As a matter of fact, if you were to call any one of your friends, you might find somebody taking statin Lipitor, but that might be, we thought it would be good to make that disclosure to counsel before we begin. All right, Mr. Ho? Thank you, Judge Niemeyer, and may it please the Court, Derek Ho for the appellants. We asked for reversal of the District Court's grant of summary judgment against more than 3,000 women who claimed that Lipitor was a substantial contributing factor in causing their adult-onset diabetes. The District Court made multiple errors that we set out in our briefs, but two are sufficient to reverse, one on general causation and one on specific causation. First, as to general causation, the District Court erred in treating statistical significance as dispositive. That contravenes the Supreme Court's decision in Matrix, this Court's decision in Westbury, the law of two other circuits, the relevance and preponderance standards, and respected scientific practice. I'm going to ask about that. So obviously the Supreme Court was dealing with the 10B-5 issue in Matrix, so a little bit different. I don't think they held that statistical significance is or is not a requirement, but isn't the case here, as I understand it, that given the methodology utilized by Dr. Singh, that is the Bradford-Hill test, that the consensus seems to be that in that context statistical significance is a prerequisite. Am I wrong about that? I think that there is no such consensus. Let me start back with Matrix. Matrix was obviously in the 10B-5 context, but recall that the argument that Matrix was making in that case was that non-significant evidence could not be material in a securities fraud case because it cannot give rise to a reliable inference of causation. So the issue of causation between a drug and a disease was precisely the issue in Matrix, although it came up in the securities context. And what the Court held is exactly on the Bradford-Hill issue. The Court will note that in footnote 7 of the Matrix case, the Supreme Court actually recites the Bradford-Hill factors as reasons why a bright-line statistical significance prerequisite is not appropriate and not consistent with scientific practice in the field. And whether this Court views that as a rule of law or as a finding of legislative fact, we think that that's binding on the district court. That is to say, if the Supreme Court says scientists can rely on non-significant evidence and still infer causation, i.e., a bright-line prerequisite is not appropriate, the district court is not free to disregard that and exclude Dr. Singh purely on the basis that as to dose lower than 80 milligrams, he could not cite one study that was statistically significant. And this Court's decision in Westbury is to the same effect. With respect to the scientific issue, it is not the case that statisticians or epidemiologists always require statistically significant evidence. If you say statistical significance, you default back to chance or randomness, right? Well, recall that what statistically significant means at the 95 percent confidence level is that there is only a 5 percent chance that the results can be attributed to chance. Well, either attribute or show an association. That's right. That the association that is perceived in the It's an association that statistical significance would show correct, not causation. That's right. There's a There's no association. There's a further inquiry that needs to be done to determine whether association gives rise to an inference of causation. It's important to note that You said he said it was controlling. I thought you said it was important. No, I think it's very clear, Judge King, that he found it controlling. What he said is, with respect to doses Did he ever use the word controlling? Well, I think this can be seen most clearly Yes, he did. He did not say controlling. He did not say controlling. He did not He used the term important. What he said, Judge King, is that No, I think the clearest articulation He didn't use the word controlling. What he did, though, is he explained his reasoning at CMO 97, page 5. This is at the Joint Appendix at 2038. And what he makes clear is that it is sufficient in his mind to exclude Dr. Singh that Dr. Singh cannot find a statistically significant study for 10 milligrams of Lipitor. That's the end of the inquiry. He doesn't say that Dr. Singh's analysis is unreliable in any other way. It is simply the absence of a statistically significant study. Well, let me, I'm looking at, you said 97. I'm looking at CMO 68, because I think I agree with you. He says, while a causation opinion may not be based on epidemiological studies, it is well established that the Bradford Hill method used by epidemiologists require that an association be established through studies with statistically significant results. It seems to be a precondition to applying this Bradford Hill method. Is that how you read it? That is how I read his ruling, but that's simply not correct. And, one, note that he does not cite a single thing from the record to support that proposition. He cites a number of district court cases that have suggested such a thing. But many of those district court cases do exactly what the district court erroneously did here, which is So let me ask you this. So without that, what's a district court then to do? What is the standard? Well, what the standard is is that there needs to be evidence of an association at the first step of the Bradford Hill. No matter how weak? No, not no matter how weak. Where do you draw the line? Well, we think that the appropriate place to draw the line is that at that first step, if there is a P value of 0.5 or less, that allows you to get to the second step. Recall that the second step of the Bradford Hill takes into account the consistency of the demonstrated association. That is to say, if you have some admittedly non-significant evidence of association at the first step, that, of course, doesn't get treated the same as if it were statistically significant at the second step. But there is no bright line rule at the first step that says you have to have statistical significance at 95 percent because that is an overwhelming probability that the data cannot be attributed to chance. It is far greater than what the relevant standard under 401 requires, far greater than what the preponderance of the evidence standard requires in the civil case. And so there is ‑‑ I would also add that if you look at Sir Bradford Hill's article himself, this is obviously his test, if you look at his article, and that's in the record as well at JA 765 to 766, he has an entire section of his article, I will say, railing against the use of bright line rules such as statistical significance. In his mind, and this is consistent with scientific practice in the field, it is not appropriate to use bright line statistical significance tests either way. In his mind, it's equally a mistake to say that statistically significant evidence is a gate that opens the door to the second step as it is to say that you need to have it. If you're identifying the error to be in order of 97, I'd like to see where you are focusing on, in particular where he made the error. CMO 68 is the exclusion of Dr. Singh. CMO 97 is his summary judgment order where he recounts the history of his rulings. And if you look at his description of his own reasoning in CMO 97, it's JA 2038, he says Bradford Hill requires a statistically significant association, that's a reiteration of the point that he made in CMO 68 that Judge Diaz was alluding to, and he says such studies do not exist for Lipitor at 10 milligrams. End of story. That is the only basis on which he says that Dr. Singh cannot reliably opine on the 10-milligram dose, the absence of a statistically significant study. Didn't he also rely on Dr. Singh's testimony back to CMO 68? He says after suggesting that statistical significance is important, he says even more to the point, Dr. Singh himself testifies that a lack of statistical significance means either the study is low power, or no risk exists, and that he doesn't know which of these possibilities is the case. So it seems like he's going beyond this mechanical rule in saying in this context, based on this expert's testimony, he can't possibly opine on risk levels below 80 milligrams. I would concede that is the only arguable place in which the district judge cited the record, and I must say that that is a mischaracterization of Dr. Singh's opinions, because Dr. Singh's entire opinion is that at 10 milligrams, although there is not one study that surpasses the 95 percent significance, he cites the ASCOT study, which comes close to statistical significance, and he also cites his own study, which he did, which has a similar positive association, but also falls somewhat short of reaching statistical significance. And he says those two studies combined, combined with the fact that there is a plausible biological explanation for this, combined with all the other factors that he appropriately takes into account in the second step of the Bradford Hill analysis, he says that that is sufficient, and he specifically says in his report, the fact that the ASCOT study is not statistically significant is not a reason to believe that it doesn't indicate a positive association and can't be used to support causation. So the notion that Dr. Singh himself said that statistical significance is a bright-line prerequisite is just 180 degrees contrary to his actual opinions, as set out in his report and at length in his deposition. I see I'm ‑‑ with respect to Dr. Murphy, we think that this court should adhere to its prior decision in Westbury and follow Chief Judge Wood's decision in the Schultz case out of the Seventh Circuit, as well as the Johnson case in the Eighth Circuit and the Messick and Wendell cases in the Ninth Circuit. All of those cases address precisely the issue here, which is whether or not a differential diagnosis of the kind that Dr. Murphy did can be admitted, and the standard is that it should be a matter for the jury as long as the doctor here, Dr. Murphy, who is a renowned endocrinologist, offers no explanation why the other factors were not the sole cause. And that includes ‑‑ that does not mean, by the way, that she has to demonstrate that Lipitor is the sole cause. The substantial factor test permits a finding of causation even when there are other risk factors. So when the district court said ‑‑ Well, but other than reciting these other possibilities, where in the record does she say these other possibilities aren't relevant in this context? I would cite to her report at ‑‑ it's JA2689 to probably 2693 or 94. She has an extensive discussion in her report where she says there are some other risk factors here, but they are attenuated and I can discount them. For example, changes in weight is a risk factor. But she notes that there were fluctuations in Mrs. Hempstead's weight that had no correlation whatsoever to Mrs. Hempstead's blood glucose. So she says that to me does not explain her diabetes. Similarly, with respect to family history, Mrs. Hempstead had some family history of diabetes, but it was attenuated. It was her father who developed it at a very, very advanced age. She had seven siblings and children that had no history of diabetes. So Dr. Murphy acknowledges the possible other risk factor, but addresses it in her report and then she further addresses it in her deposition. So the idea that she simply said post hoc ergo proctor hoc and didn't address at all the other risk factors is, again, I think, just flatly contrary to the record as set out in her report and in her deposition. She clearly surpasses the standard that this court set out in Westbury, that it reaffirmed in the Cooper case, which is from 2001, and reaffirmed it yet again just last year in Judge Wilkinson's opinion for the court in Chick Vashvili. The standard is did she offer some explanation for discounting the other alternative causes, and she clearly did that in her report and in her deposition. I'd like to stress one other point, which is that the reversal on the statistical significance issue at least warrants vacater of the district court's exclusion of Dr. Jewell. And the reason for that is that the district court's exclusion of Dr. Jewell was distorted by the same error that he made with respect to Dr. Singh, which is to view no significant association as meaning no association. And for that, I would point the court to CMO 54 at page 25. That's JA 1513. And what he says about Dr. Jewell is that the Ascot study found no statistically significant difference in the rate of new-onset diabetes between those on Lipitor and the control group. In other words, the study did not find an association between Lipitor and new-onset diabetes. So he's equating no significance with no association. And then he says, in his supplemental report, Dr. Jewell conducted his own analysis of the Ascot data and opines that there is an association, reaching a result contrary to that of the peer-reviewed published article on Ascot LLA. So the logic is no significance means no association. Dr. Jewell does a reanalysis and finds significance, and that means there is an association, and those are thus contrary opinions that can only be justified with a very high degree of rationale. Well, I thought he went beyond that. I mean, he had some issues with Dr. Jewell's methodology. He thought that he was less than an honest broker in terms of how he handled the data and sort of used various tests to get to the result that, as Judge Gerber put it, the result that he wished to get to. I mean, given that we're dealing with an abuse of discretion, how can we say that he abuses discretion with respect to his findings? That's why I say, Judge Diaz, that if you follow Matrix and Westbury and find that statistical significance is not a bright-line prerequisite, there should at least be a vacater of the ruling with respect to Dr. Jewell because the district courts, all of those rulings, are colored by the view that Dr. Jewell was coming to a completely contrary conclusion to what the published peer-reviewed data said. He was not coming to a contrary conclusion. His conclusion was consistent with the published data. It found a slightly higher positive association, and it found less attribution to chance, in other words, greater statistical significance. But to say that those are contrary is completely, again, commits the same fundamental error that the district court made with respect to Dr. Singh, which is to confuse the absence of statistically significant data, i.e., less than a 5 percent chance that it's attributable to chance, with a finding that there is no association whatsoever. With the Court's permission, I'll reserve the balance of my time. Thank you, Mr. Cope. Mr. Sheffo. Good afternoon, Your Honor. May it please the Court, my name is Mark Sheffo, and I represent Advisory Connection with this matter. I'd like to just start by suggesting that Judge Gergel did exactly what we as litigants and what you as appellate court should want a judge to do, which is to actually look at the methodology, spend the time. I mean, this was an MDL case, and, yes, there were a lot of cases at issue, but there was over 12 million pages of documents produced. There were scores of experts. There was multiple, as you saw on the record, opportunities where Judge Gergel didn't just say, here's a flaw, gotcha. He basically highlighted what his concerns were, gave multiple opportunities for the plaintiffs to submit reports. There was order shall cause process with respect to the summary judgment issue. So this was a situation where the Court started out not looking at conclusions but trying to understand the methodology and spent a lot of time. There's actually five full days of hearings. So I would just highlight that. And I think also, I want to get. . . There was no evidentiary here. You were, like, arguing. Well, he didn't take live testimony, Your Honor, but he did. . . As you could probably see in the record, Judge Gergel read every deposition transcript, had multiple opportunities. So there were. . . Those five hearings were lawyer argument, but it was based on the issues. There were eight experts. And as Your Honors know, he didn't exclude willy-nilly all of these folks kind of across the board. He allowed the 80 milligrams to go forward. The counsel spent. . . And these are extremely skilled counsel here and, frankly, below. And I think that's kind of important for the Court to recognize, that these were some of the best lawyers in the country who do mass torts, I have utmost respect, and they were able to take their best shot with their experts. And Judge Gergel didn't disqualify these folks with respect to qualifications. It was on methodology. Now, counsel spent a good amount of time talking about statistical significance. And here's what I would say, a few things. Respectfully, that's a straw man argument. There's nowhere, and I think, Judge King, you pointed this out, Judge Gergel never said there's a bright line, nor is that an issue before the Court. He basically said statistical significance is important. It's not absolute. If anything, the folks who in this case, and this is not for all cases, all situations, but this is. . . Counsel, you saw me read from Judge Gergel's order. Yes. In CMO 68, where he said exactly that. He said this was a requirement. Well, this is what he said. So I think what counsel didn't highlight. So this is at JA 2218. This is Dr. Singh's report, right? And what Dr. Singh says, and admittedly, I'll read it slow. It's a little. . . This is at JA 2217, 18, page 32, 33 of the report. What Dr. Singh said, he'll set forth nine criteria. The presence of any single criteria does not provide absolute proof of causation, and the absence of any single criterion does not necessarily imply that the association may be causal. One minor caveat is that statistical significance of the association is met before applying these criteria. So basically, it was Dr. Singh who said with respect to Bradford Hill, you have to have statistical significance. Another of their experts, who was Dr. Gale. . . Okay, well, and I read that to counsel as well. So then Judge Gergel found as a fact, at least with respect to Dr. Singh's testimony, he was requiring statistical significance as a precondition for applying the Bradford Hill test. I don't think it was a requirement. I think it would be unfair to basically suggest that Judge Gergel said it's a bright line requirement, and this Court would be affirming that there's a bright line requirement. I think what he, what Daubert and kind of the progeny have said is this is an abusive discretion standard. The judge has to have some leeway as to how he's going to determine the methodology. It was Dr. Singh who said that. Here's what Dr. Gale said as well, Your Honor. You don't reach conclusions about the relationship between a medication and a particular outcome when data are not statistically significant. This is their plaintiff's expert. Non-statistically significant data are merely hypothesis generating and cannot confirm a hypothesis that an exposure is associated with a particular outcome. Another of the plaintiff's experts, Dr. Wells, said statistical significance is important because the significance guarantees that you controlled possible error. Without it, random error, and this is not a quote, but random error has been controlled. This is a quote. You didn't reject the null hypothesis. That's Wells Depot at 4849 Joint Appendix 57879. So what Judge Gergel did was he said I need to look at this case before me. We have a statistically significant, I'm sorry, we have a study that was looking at this long-term study that didn't find statistical significance. You have Dr. Singh saying it's important, in fact saying it's required. You have their other experts saying in this case it's important and required. And so he said looking at that, I'm going to kind of take them at face value, and he didn't say, I mean we wouldn't have had five hearings and multiple if this was a check the box kind of thing. Excuse me. One other point I think I would just raise is what Judge Gergel said. I think it's kind of unfair to kind of look at a summary judgment decision kind of talking about the prior decision. I think what we need to do is go to CMO 68, I think as your honors did, and what he said is that plaintiffs have failed to demonstrate that Dr. Singh's reliance on non-statistically significant trends is accepted in his field, that non-statistically significant findings have served as the basis for any epidemiologist causation opinion in any peer-reviewed literature, or that standards exist for controlling the technique's operation, which suggests a lack of reliability. So what he did was he looked at the playing field. He listened to the plaintiff's own experts saying that this is an important factor. He then said you didn't meet it, but then he looked at the ways that they had tried to fashion their report and their methodology and then made a determination, fully appropriate, that they actually had not kind of satisfied the appropriate methodology. With all due respect, this is frankly exactly what courts want district courts to do, which is to dig in, to give a fair shot, to give every opportunity. And then he said, I think as you read, his own testimony demonstrates that studies without statistical significance are insufficient to support causation opinion. That ties back to his own report and his testimony. With respect to, just briefly, with respect to Dr. Jewell, I think as you, Your Honor, Judge Diaz, you had highlighted there was much to his opinion with respect to Professor Jewell. Professor Jewell first, in his first testimony, his first report said, I consciously chose not to address the ASCA. When he was essentially called out for that, he went back and Judge Gergel allowed him an opportunity to address that particular study. He ran a whole host of computations and couldn't find any way to get around the statistical significance. Eventually he ran enough tests and enough data that he came out with a new report. Now, interestingly, Dr. Singh never relied on that. It almost has nothing to do with respect to Dr. Singh, and Dr. Jewell is not a causation expert. So it was only essentially with using unadjudicated data, trying to second-guess the studies, trying to manipulate information that the doctors and blinded studies had looked at, and frankly, Judge Gergel dug into all this. This wasn't kind of a headline, here's what happened. He understood all these issues, and that's why he had all these hearings. That's not the way that methodology should work. He also looked at the way that Professor Jewell analyzed the NDA data. That's the new drug application. It's all the kind of data that Pfizer had and submitted to the FDA, and it's voluminous. And he basically said, this is not a fair and appropriate way in order to analyze this data. You're result-driven. Certainly this court is not bound or may not even find it instructive, but we've noted in our brief that the Third Circuit affirmed Judge Roof with respect to Professor Jewell in the Zoloff litigation where essentially she found that he had engaged in much the same kind of conduct. And kind of as a footnote, one of the main arguments before the Third Circuit was that Judge Roof had created a bright-line rule as to statistical significance, and, of course, that court found, as we think this court should, that that's not what Judge Roof did. That's not what Judge Gergel did. I think Judge Gergel in particular is pretty direct on what he believes and what he doesn't, and if he was creating a bright-line rule, I think we would all be able to find that and cite to that. And then I think, finally, with respect to Dr. Murphy, you're certainly not going to hear me or us ever argue that differential diagnosis or differential ideology is something that the court shouldn't recognize or that it's not a generally accepted methodology. I think what you will and you have heard us argue and what I think Judge Gergel determined is consistent with Westbury and your Honor's decisions with respect to the Cooper case is that kind of just chanting the talismanic words that this was a differential ideology or differential diagnosis essentially doesn't cut it. I think the court, in analyzing Dr. Murphy, should look at two things respectfully. One is she created a five-step test in her report. She kind of admittedly only did four of the five steps, and the fifth step was essentially the most critical step, which is she could not determine that this diabetes or the diabetes incident could not have happened or would not have happened absent the other factors. So, again, we're not arguing that there aren't things like substantial contributing factors or you could have a contribution, but what Judge Gergel said was you have not in any way given a methodology and given an opinion where you've said this couldn't have happened but for these other things, weight gain, metabolic, which are essentially by orders of magnitude, even by the plaintiff's own position, higher risk factors. So that was the flaw here. And, again, the plaintiffs were given I think four opportunities to come forward. If you want to have a new expert, you don't agree with Dr. Murphy, you can do that. None of them did that at any point in this. Was Dr. Murphy required to find that the use of Lipitor was the sole cause? She was not. She was not. And I don't think that was the requirement. And, again, I think as a background, we all bring our experience, as the Court likely knows. I mean, Judge Gergel was a former plaintiff's single event and personal injury lawyer. I mean, he understood that there were things like contributing factors, contributing causes. We never argued that you had to identify the specific cause. We basically argued you had to have a methodology that would identify why this is a substantial factor. And, frankly, what was interesting, there was never an examination of the patient by Dr. Murphy. That's not dispositive, but, you know, it's a factor. Dr. Murphy had seen scores of people with diabetes. What she testified, she had never, ever diagnosed anybody other than this particular plaintiff with Lipitor-induced diabetes. She had never employed this methodology other than in this litigation for the first time ever. So these are all factors that, you know, Daubert and Progeny talk about in terms of, you know, kind of employing practices and methodologies that are not used in the normal course, when a doctor like Dr. Murphy certainly had every opportunity to do that in her general practice. So I still have some time. You know, I'm happy to address any questions that the Court has, but I would, you know, probably just, you know, cede some of my time and maybe just wrap up, again, unless the Court has any issues that you're concerned about. And I would say this, just to reiterate, this is a situation where a court took painstaking time over the course of years. This isn't that these folks never had their day in court. represented by very skilled counsel, experts that were highly regarded, and they were unable to meet what this Court and, frankly, the Supreme Court has said with respect to methodology. And it's important to note that what Judge did was look at each and every one of these experts, looked at dose and broke it down by dose, which they own, their own experts said dose was important. For his general causation determination, he said 10 essentially doesn't meet it. It was Dr. Singh that said, I have nothing more at 20 or 40. So if 10 is not in, 20 and 40 is out, so that was granted. He actually allowed many of the plaintiffs to proceed with respect to 80 milligrams. So he took a very careful, surgical, you know, not one-size-fits-all approach. And then with respect to Dr. Murphy, she was a specific causation expert. He excluded her, wrote an opinion. It was then the plaintiffs that basically he said, well, if there's any other experts who you'd like to proffer with respect to specific causation, I'm going to allow a procedure. All you have to do is give me notice that you'd like to produce some information. He did that four times. And basically none of the experts, I'm sorry, none of the plaintiffs came forward and said, you know, I have an expert. I can do something differently. So that led necessarily to the summary judgment determination, which was consistent with frankly every MDL court would do. May I ask about the Matrix opinion? Yes, Your Honor. I read Judge Gergo's orders. I don't recall that he ever mentioned Matrix at all. Was that ever a subject of discussion in the arguments? I believe it was. There was a lot of arguments. So I think towards the end, again, Mr. Ho is a very skilled lawyer. His firm actually represented successfully, I think, the plaintiffs in the Matrix case. So I think at the end it actually was an issue. And I think one of the points that I would raise with Your Honor is, first of all, as you know, it's a securities case, right? And in reading that case, the court specifically says we recognize that the application of Daubert in kind of pharmaceutical type or other cases is, you know, well developed and we're not addressing that. And kind of interestingly, and I think we cite this in our brief, again, the skilled counsel in their representing the plaintiffs in that case, they specifically in their brief said this is different than Daubert for pharmaceutical, mass tort, medical device cases, because the concept of materiality under the security standard is not the same as it is here. Now, even with all of that, you know, Matrix would only, even if it was relevant and Your Honors were going to rely on it, it would seem to only be kind of an issue if you bought into the argument that Judge Gerber created a bright line rule and said you have statistical significance. And that's frankly, respectfully kind of impossible to find here. You know, particularly, you know, if you carve out all of the testimony from the plaintiff's own experts, which basically highlighted the importance. And that's all that this was. They said it was important. The manual says it's important. In fact, Dr. Singh went further and said not only is it important, but essentially it's dispositive, as did Dr. Gale and Dr. Wells. So Your Honor, it's a very good question. I mean, there's a, I'm smiling only because the concept of preemption, which is I think you're getting there. I think there are some issues, you know, with respect to compliance. And there's a few. Yes, Your Honor. No, no, no. Look, it's a fair question. I mean, the Japanese labeling did come up for the benefit of Your Honors. I mean, they're, and I think everyone kind of can see. I expect that somebody would agree. No, no, absolutely. And the issue there is, frankly, the regulatory scheme in Japan is very different. So, in other words, if they get a certain number of adverse event reports, they basically don't do kind of the same type of causal analysis that the FDA. It's certainly their province to do that. That's their country, their folks. But they take a much more conservative approach. So, if you looked at a Japanese label, it would be, you know, kind of a much, for almost any medicine, it would have a lot more information, a lot more warnings and things that our FDA, and it's their province, has determined that they have certain levels of warning for causation. That's something to see because the labels that we get are pretty long. Exactly. And small sometimes, admittedly. But there is a, I think they're, on the record, I don't think the plaintiffs have seriously argued that they could overcome an expert burden based on, you know, the labeling from Japan. But to the extent Your Honor did address it, the courts and experts did address that below and basically highlighted that, you know, while it might be an evidentiary issue if we ever got there and Judge Kerr will have to. There isn't a record about whether the FDA has ever directly looked at it and rejected the proposition or something. I would only say this, Your Honor. I don't recall that. The record is pretty voluminous here, so I don't want to say 100%. But certainly the FDA are pretty sophisticated folks and they know what's going on around the country. And, frankly, even with all of this that's happened, you know, it's not like yesterday. The FDA came out with a black box warning and said, you know, Lipitor now causes diabetes. So, to my knowledge, there's been no significant or even really any labeling changes in the U.S. with respect to diabetes other than what was in the record. Is this one of the most commonly used medications in the world? I think statins are. Yeah, I think that's absolutely fair, and you're right. Is that the generic? It is, you know. Yes. Many of us who are of an age over 50, men and women, take Lipitor. Lipitor is off patent now, so you probably see it as a torvastatin. But there are five or six statins that are widely prescribed and probably still some of the most prescribed medicines. All right. Thank you, Your Honors. Mr. Hull. Please, the Court. What's telling about my friend's argument as to why there was no bright-line rule here is that he cites aspects of the record that the district court never did. The district court never cited to Dr. Gale. The district court never cited to Dr. Wells. What the district court cited to is a number of district court cases that it erroneously interpreted as adopting a bright-line statistical significance test, and it did so without once citing Matrix, without once citing Westbury, which the court in Matrix described as having adopted a rule that rejects a bright-line statistical significance. So it went off on a rule of law, not on a finding of fact. And to the extent that it cited Dr. Singh, I would ask the court to look at the aspects of Dr. Singh's report and deposition that are actually cited. As to the citation that my friend recited when he was at the lectern, the next sentence of that very same opinion, this is Dr. Singh's initial opinion, JA-2218, is, however, one has to bear in mind that for rare harmful outcomes, studies may not be adequately powered to rule out clinically significant harm, although it may be statistically insignificant. And in his rebuttal report, this is JA-2783, he says, in this case statistical non-significance in the ASCOT trial does not provide support for the null hypothesis of no difference in the risk of diabetes between atorvastatin 10 milligrams and placebo. So the idea, again, that Dr. Singh boasted himself on his own petard is simply inconsistent with the record. With respect to Dr. Murphy, Pfizer has no response to the Schultz case, the Johnson case out of the Eighth Circuit, Wendell, and Messick. Those cases, we think, provide the path to a reversal on that issue. What they say is that when a qualified expert, and here there is absolutely no doubt that Dr. Murphy is one of the preeminent endocrinologists in the country, clinical professor at University of California San Francisco, chief of endocrinology at San Francisco Hospital, has seen diabetes cases for decades. She looked at this patient and she said that these other risk factors that she admitted are statistically speaking potential risk factors for diabetes are not the sole explanation for Mrs. Hempstead's diabetes. And on that basis and on the basis that Lipitor can increase the risk of diabetes, even controlling for all of those other risk factors, led her to conclude to a reasonable degree of medical certainty that the Lipitor was a substantial factor. And Pfizer now acknowledges that it doesn't have to be the sole factor, which is exactly right as a matter of black-letter tort law. So she didn't have to even rule out the possibility that some of these other risk factors were also playing some substantial contributing role, but she said they cannot provide the sole explanation for Mrs. Hempstead's diabetes. And that's a classic jury question at that point. So it's but-for causation, isn't it, what we're talking about? It is but-for causation. But in the context of these kinds of products liability cases, but-for does not mean that the other alternative causes play no role. If you look at the- Without the Lipitor, she would not have gotten diabetes. No, that's- But-for the Lipitor, right? No, that's not right, Your Honor. Tell me what the standard is. Right. The standard, this goes back to the restatement of torts, second section 432, subparagraph 2, and now the third restatement, section 27. The classic case of the two fires that converge on the house, one fire having been caused by the defendant's negligence, the other fire not having been caused by the defendant's negligence. The fact that the second naturally occurring fire may have consumed the plaintiff's house does not mean that the fire caused by the defendant's negligence is not a substantial contributing factor. It's a substantial contributing factor as long as it plays some substantial contributing role in causing the conflagration of the plaintiff's house in that example. And the restatement is very clear that that applies equally to products liability drug cases. That is to say, and again, Chief Judge Wood makes this absolutely clear in her opinion in Schultz, even if in that case the plaintiff's cancer could have also been caused by the plaintiff's smoking. In that case, the plaintiff was a smoker and got cancer, and the claim was that the cancer was the result of exposure to benzene. Even though smoking also increases the risk of cancer, and even though the doctor in that case could not rule out the possibility that the smoking also would have caused the plaintiff to have cancer, Chief Judge Wood said in her opinion that is not the standard for substantial factor. The substantial factor test is did the benzene also contribute to the plaintiff's cancer, and that's the same analysis that should apply here. Even if there are some other risk factors, and again, Dr. Murphy discounted many of them and had very cogent explanations as to why they were not the sole cause. But even if they played some contributing role, that does not mean that Lipitor didn't also play a substantial contributing role. Thank you. Thank you, Your Honor. We'll adjourn court for the day, come down and recount. This honorable court stands adjourned until tomorrow morning. God save the United States and this honorable court.
judges: Paul V. Niemeyer, Robert B. King, Albert Diaz